**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-CR-20001** |
| | ) | |
| **ANTONIO SHERROD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on Defendant Antonio Sherrod's Motion Requesting Post-Conviction DNA Testing Pursuant to 18 U.S.C. § 3600 ("Defendant's Motion") (d/e 130).  For the reasons stated below, Defendant's Motion is GRANTED.  The Court appoints the Federal Public Defender Office as counsel for the Defendant pursuant to 18 U.S.C. § 3600(b)(3) for the purposes of coordinating the DNA testing.  The Court ORDERS Defendant to file additional briefing regarding Defendant's position on testing procedures pursuant to 18 U.S.C. § 3600(c) within 21 days of this Order.

# I. BACKGROUND

In March of 2003, Stephen Prendergast stopped at a gas station in Kankakee, Illinois, around midnight. Prendergast was driving to Champaign, Illinois, with his girlfriend in a 2003 Cadillac Escalade. While Prendergast went inside the gas station's convenience store, a Dodge Intrepid parked at a gas pump adjacent to the Escalade. When Prendergast returned to the Escalade, an individual exited the Intrepid and shot Prendergast at point-blank range after demanding the keys to the Escalade. Prendergast died shortly afterward from a bullet that pierced his heart.

Prendergast was a resident of Matteson, Illinois, located north of Kankakee, Illinois. His girlfriend, Regan Booker[1], also lived in Matteson. Regan Booker, Loren Booker (Regan's sister), and Loren's friend, Tiffany Sanders, attended Parkland College in

---

[1] The witness's name has alternatively been spelled "Regan" and "Reagan" throughout various documents in this case. Compare Pet. Mot. (d/e 130), Gov't Resp. (d/e 134), and United States v. Sherrod, 445 F.3d 980, 981 (7th Cir. 2006) (all spelling witness's name as "Regan"), with Gov't Witness List (d/e 36); Sherrod v. United States, Case No. 08-cr-2013 (C.D. Ill.), Order (d/e 16) (spelling witness's name as "Reagan"). As the parties appear to agree for the purpose of this Motion that the witness's name is spelled "Regan," the Court will adopt that spelling as well.

Champaign, Illinois.  They often travelled back and forth between Matteson and Champaign.

On March 16, 2003, Prendergast, Regan and Loren Booker, and Tiffany Sanders departed from Matteson on their way to Champaign.  Prendergast and Regan Booker rode in Prendergast's Escalade, while Loren Booker and Sanders travelled in a second car.

Shortly before midnight, the group stopped at the Amoco gas station in Kankakee.  Prendergast parked his Escalade near one of the gas pumps.  Sanders parked the second car on the opposite side of the same pump island.  Prendergast entered the adjacent convenience store, while the others waited outside.

Video evidence showed that while Prendergast was in the store, a tan or gold Dodge Intrepid arrived at the gas station, slowly circled around the Escalade, and parked at an adjacent pump island.  An individual, later shown to be the perpetrator, was in the backseat on the passenger side of the Intrepid.  He got out of the Intrepid, and then went back to put on a black jacket.  He approached the front of the store and then returned to the Intrepid, which had pulled up to the store to meet him.  After the perpetrator

got back into the Intrepid, the Intrepid again drove slowly past the Escalade and left the gas station.

Shortly after the Intrepid departed from the gas station, Prendergast left the store and returned to the Escalade. Immediately after Prendergast and Regan Booker entered the Escalade, the perpetrator, brandishing a 9 mm gun and wearing a black Carhartt jacket, confronted Prendergast at the driver's door and shot him through the left arm. The bullet traveled through Prendergast's arm and into the left side of his lower chest, piercing his heart.

Regan Booker jumped out of the Escalade, ran to the back, and peered around the vehicle to where the perpetrator and Prendergast were standing. The perpetrator demanded the keys to the Escalade and attempted to shoot Prendergast a second time, but the gun malfunctioned. Regan Booker saw the perpetrator's face as Prendergast, who was doubled over, slid the Escalade's keys to him. As the perpetrator fled the gas station in the Escalade, Prendergast collapsed on the gas station lot. The incident was captured on video by the store's security system.

The incident was also witnessed by Shay Guttendorp, a store employee, who called 911. An ambulance and law enforcement officers arrived at the scene shortly after the 911 call. Prendergast was rushed to the hospital, but died from the gunshot wound.

The perpetrator stole the Escalade, but police found the vehicle abandoned several hours later in an area north of the gas station. A short distance from the Escalade, police recovered a black Carhartt jacket and the handgun used in the attack.

The police investigation soon identified Defendant Antonio Sherrod as a suspect in the crime. A fingerprint analysis determined that Sherrod's fingerprints were found inside the Escalade, on the steering wheel and the driver's door. Forensic evidence linked the bullet fragment that caused Prendergast's death to the handgun found near the scene. Evidence from various witnesses also linked the handgun found near the Escalade to Sherrod, who witnesses claimed had stolen it just weeks prior to the shooting. At trial, Sherrod attacked the credibility of these witnesses, in part, based on their inconsistent statements and on the promises of immunity they were given by the Government in exchange for their testimony.

Later, at Sherrod's request, analysis was also done on the black Carhartt jacket found near the Escalade. A report from the Illinois State Police Division of Forensic Services determined the jacket contained DNA that was linked to at least three people, but a stain on the wrist of the jacket and hair found on the jacket did not contain enough information to make positive identification. Resp. Ex. B at 12–15 (d/e 134-1). DNA retrieved from hair found on the jacket revealed that Sherrod could not be excluded as a source for the DNA, which experts testified could only have come from a person within a group comprising .25% of the North American population.

In late 2003, after the investigation had identified Sherrod as a possible suspect, Regan Booker and Shay Guttendorf were shown a six-person photo array that contained Sherrod's photograph. Both women identified Sherrod as the person who shot Prendergast. The defense questioned the credibility of these witnesses.

On December 8, 2003, Sherrod was charged in a criminal complaint and this case, in the United States Central District of Illinois, was opened. Complaint (d/e 1). Sherrod was arrested and taken to the Kankakee Police Department. Lieutenant Pat Kane of

the Kankakee Police Department and Special Agent Dennis

Fritzsche planned to interview Sherrod and activated a video

recorder.  Sherrod appeared upset about being arrested and asked

"what this all about, man?"  Eventually Sherrod stated that he did

not want to be recorded, and the officers turned off the video.

Officers testified that, after receiving <u>Miranda</u> warnings, Sherrod

was told by Kane that he was under arrest for car-jacking and

murder.  During the interview, Sherrod first denied that he had ever

been inside the Cadillac Escalade.  Without being told about the

evidence against him, Sherrod made statements including: "I'll bet

the video don't show my real face, do it?," that the woman in the

front seat of the vehicle "can't identify me," and that you "[c]an't

trust those whores at the gas station."  He also denied that his

fingerprints would be found on the gun or in the vehicle.  After less

than 15 minutes, Sherrod invoked his right to counsel, and the

interview was terminated.

On December 9, 2003, Sherrod was transported to the Federal

Courthouse in Urbana, Illinois.  After observing that Sherrod

appeared highly agitated, a Deputy U.S. Marshal requested that

Special Agent Fritzsche attempt to calm him down.  After Fritzsche

approached Sherrod's cell, Sherrod volunteered that he should not be in trouble if he had only tried to steal the radio.

Sherrod's case proceeded to a five-day jury trial in the Central District of Illinois in October 2004. At trial, the Government's theory was that Sherrod's friend, Derrick Crawford, had driven the Dodge Intrepid, that Sherrod had exited the vehicle at the gas station, and that Sherrod was later the perpetrator in the crime. The defense theory was that Derrick Crawford was the true perpetrator and that Sherrod was not involved in the murder or carjacking. On October 20, 2004, the jury found Sherrod guilty of carjacking with the intent to cause death and serious bodily harm (18 U.S.C. § 2119(3)), carrying and using a firearm to commit first degree murder (18 U.S.C. §§ 924(c)(1)(A)(iii), (D)(ii) and (i)(1)), and felon in possession of a firearm (18 U.S.C. § 922(g)(1)). Jury Verdict (d/e 69, 70, 71).

On February 11, 2005, District Judge Michael P. McCuskey sentenced Sherrod to two consecutive terms of life imprisonment. Judgment (d/e 91). Sherrod appealed his conviction, challenging the jurisdictional basis of the carjacking conviction, the trial court's admission of statements made after his arrest, and the

determination of his sentence.  United States v. Sherrod, 445 F.3d 980, 981 (7th Cir. 2006).  The Seventh Circuit rejected each challenge and affirmed Sherrod's conviction.  Id.

Sherrod subsequently filed a Motion to Vacate, Set Aside, or Correct his sentence under 28 U.S.C. § 2255.  Mot. to Vacate, Case No. 08-CV-02013, (d/e 1).  In conjunction with his § 2255 motion, Sherrod also filed a motion requesting additional DNA testing of the hair found at the scene of the crime and the stains on the jacket. Mot. Requesting Discovery, Case No. 08-CV-02013, (d/e 3).  The Court denied Sherrod's § 2255 motion, finding that Sherrod was not entitled to relief on any of the grounds raised.  The Court also denied Sherrod's motion requesting discovery, finding that Sherrod failed to show good cause for the discovery or that a constitutional violation occurred during his trial.  Opinion 29–30, Case No. 08-CV-02013, (d/e 16).

Sherrod filed the instant Motion on July 12, 2018.  Def. Mot. (d/e 130).  Sherrod asserts he is innocent of the charges and that he was framed.  Sherrod moves under 18 U.S.C. § 3600 to have additional DNA testing performed on the hairs and sweat found on the black Carhartt jacket.  Specifically, Sherrod states that there

were hairs found on the jacket, a "Negroid head-hair fragment, additional human hairs, and one (1) apparent eyebrow/eyelash." Id. at 10. Additionally, there were sweat stains on the wrist area, neck area, and chest of the jacket. The results of the sweat stain that was tested prior to trial revealed that it belonged to three different contributors, but the test could not identify a particular person. Id.

Sherrod asserts that a new form of DNA testing known as "low-copy-number" analysis would allow for a more accurate DNA profile of the individual he asserts was the murderer. Sherrod also asserts that:

> Today, most large labs have access to cutting-edge extraction kits capable of obtaining usable DNA from the smallest of samples, like so called touch DNA (a smear thumbprint on a window, or a speck of spit invisible to the eye), and of identifying individual DNA profiles in complex mixtures, which include genetic material from multiple contributors.

Id. at 14. Further, Sherrod states "[a] Pittsburg[h] based company, Cybergenetics has the capabilities in testing the sweat, and hair fibers located on the Black Carhartt Jacket [and] even re-analyze the one (1) hair fiber that was tested." Id. at 15.

In response, the Government argues that the Sherrod has failed to meet all ten of the requirements under 18 U.S.C. § 3600 and, therefore, his motion must be denied. (d/e 134). The Government reports that the head hair fragment submitted for DNA testing during the trial was consumed during the testing, so no longer exists. Id. at 12. However, the Government does have possession of the additional head/eyebrow/eyelash hairs found on the jacket and possible stain evidence found in the left wrist area of the jacket. Id.

Sherrod submitted a Reply on January 25, 2019, (d/e 137), which included an Affidavit of Innocence (d/e 137-1).

## II.  ANALYSIS

Motions for postconviction DNA testing made pursuant to 18 U.S.C. § 3600 must fulfill ten requirements before testing will be authorized. <u>United States v. Thomas</u>, 597 F. App'x 882, 884 (7th Cir. 2015). The ten requirements defendants must meet are: (1) an assertion under penalty of perjury of the defendant's actual innocence; (2) the specific evidence to be tested must have been secured in relation to the prosecution/investigation of the offense; (3) the evidence to be tested must not have been previously

subjected to DNA testing or the request must be for a new method or technology of DNA testing; (4) the evidence must be in possession of the Government; (5) the testing is reasonable in scope; (6) the theory of defense is not inconsistent with the defense presented at trial; (7) the identity of the perpetrator must have been at issue at trial; (8) the DNA testing requested must produce evidence that raises a reasonable probability the defendant did not commit the crime; (9) the defendant will provide a comparison sample of DNA; and (10) the motion is made in a timely fashion. 18 U.S.C. §§ 3600(a)(1)–(10).

The Government does not dispute, and the Court agrees, that Sherrod has met the requirements under subsections (a)(2), (4), (5), (6), (7), and (9). Under subsection (a)(2), the specific evidence Sherrod seeks to be tested must have been "secured in relation to the investigation or prosecution," 18 U.S.C. § 3600(a)(2), and subsection (a)(4) requires that the evidence must be in the possession of the Government and have been subject to a chain of custody and properly retained. 18 U.S.C. § 3600(a)(4). Here, the Government reports that the head hair on the black Carhartt jacket that was previously submitted for DNA testing was consumed

during testing. Resp. at 20 (d/e 134). Accordingly, Sherrod plainly cannot obtain additional testing on this hair. However, the remaining evidence is still available for testing: (1) the additional head hairs and eyebrow/eyelash hair that were taken from the black jacket; and (2) the black jacket itself, which may still contain additional stain evidence.

Under subsection (a)(5), "[t]he proposed DNA testing [must be] reasonable in scope, use[ ] scientifically sound methods, and [be] consistent with accepted forensic practices." 18 U.S.C. § 3600(a)(5). Sherrod seeks additional testing of only a few hairs and potential sweat stains using methods such as "low-copy-number" and "touch DNA." The Government has not presented any evidence that these methods are not scientifically sound or inconsistent with accepted forensic practices. Accordingly, the Court finds that subsection (a)(5) is met as well.

Under subsection (a)(6), Sherrod must identify a theory of defense that "is not inconsistent with an affirmative defense presented at trial; and would establish [Sherrod's] actual innocence" of the offense, 18 U.S.C. § 3600(a)(6), and under subsection (a)(7), the identity of the perpetrator must have been at

issue during the trial. 18 U.S.C. § 3600(a)(7). Sherrod's theory here and at trial is that he was framed, and that Derrick Crawford was the person who committed the crime. The Government has not identified any inconsistencies, nor has the Court. Accordingly, the Court finds that subsections (a)(6) and (a)(7) are satisfied as well. Finally, Sherrod has certified that he will provide a DNA sample for the purposes of comparison, in satisfaction of subsection (a)(9).

However, the Government argues that Sherrod's request must be denied because he cannot meet subsections (a)(1), (3), (8), and (10). Specifically, the Government argues that Sherrod has not asserted his actual innocence in accordance with subsection (a)(1), that Sherrod failed to request DNA testing earlier, making him unable to meet subsection (a)(3), that he has not shown that the DNA testing results could create a reasonable probability that he did not commit the offense pursuant to (a)(8), and that Sherrod's request is untimely under (a)(10). The Court disagrees with the Government and finds that Sherrod has met all the requirements in subsections (a)(1)-(10).

## A. Defendant Adequately Asserts his Actual Innocence Pursuant to 18 U.S.C. § 3600(a)(1).

In his motion, Sherrod alleges that he is innocent of the murder of Stephen Prendergast and that the true murderer, Derrick Crawford, can be identified using untested DNA evidence, including hair from the Carhartt jacket, through a new and improved DNA testing, including "low-copy-number" analysis.  Subsection (a)(1) requires Sherrod to assert under penalty of perjury that he is actually innocent of the federal offense for which he is imprisoned.  18 U.S.C. § 3600(a)(1)(A).  The Government argues that Sherrod did not assert his actual innocence under penalty of perjury in his original motion, but concedes that it may be implied from Defendant's motion.

The Court agrees that Sherrod's Motion implies that he argues he is actually innocent of the offense.  Additionally, Sherrod has attached an "Affidavit of Actual Innocence" (d/e 137-1) to his reply in support of his motion.  Sherrod's affidavit contains a certification in substantially the form required by 28 U.S.C. § 1746, stating under the penalty of perjury that what Sherrod says about his innocence is true.  The Court finds that this affidavit satisfies the

requirement that Sherrod assert under penalty of perjury that he is actually innocent of the offense pursuant to 18 U.S.C. § 3600(a)(1). See United States v. Monell, Cr. No. 13-163-WES, 2017 WL 5564572, at *10 (D.R.I. Nov. 17, 2017) (finding that an applicant who asserts his innocence in an affidavit attached to a motion has satisfied this requirement); see also, Calhoun v. Detella, 319 F.3d 936, 943 (7th Cir. 2003) (noting that pro se litigants' pleadings are to be construed liberally).

### B. The Requirements of 18 U.S.C. § 3600(a)(3) are Met Because Defendant's Failure to Request DNA Testing of the Evidence at Trial does not Bar a Request for Postconviction Testing.

To meet the requirements of subsection (a)(3), Defendant must show that:

The specific evidence to be tested--

(A) was not previously subjected to DNA testing and the applicant did not knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing; or

(B) was previously subjected to DNA testing and the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing.

18 U.S.C. § 3600(a)(3). The Government suggests that because Sherrod failed to request DNA testing of the evidence at trial, Sherrod is barred from requesting postconviction DNA testing now. However, nothing in the requirements of § 3600 prohibits requesting DNA testing of a piece of evidence that was available at trial, but not tested. The DNA testing statute only says that the specific evidence to be tested must not have been previously subjected to DNA testing and the defendant must not have knowingly failed to request testing in a prior postconviction motion for DNA testing. 18 U.S.C. § 3600(a)(3)(A). Accordingly, the Court finds that the failure to request DNA testing at trial has no bearing on this motion. See United States v. Fasono, No. 3:04-cr-34-WHB, 2008 WL 2954974, at *6 (S.D. Miss. July 29, 2008), rev'd on other grounds 577 F.3d 572 (5th Cir. 2009) (finding that failure to request DNA testing pre-trial does not preclude an applicant from seeking relief under 18 U.S.C. § 3600).

The evidence at issue here, DNA evidence on the jacket, which includes additional hairs and eyebrow/eyelash hair and additional stains on the jacket, has not been previously subjected to DNA testing. Sherrod has not made any other motions under 18 U.S.C.

§ 3600, so Sherrod did not knowingly fail to request DNA testing of the evidence in a prior motion for postconviction DNA testing. Further, while not a motion under § 3600, Sherrod did request DNA testing of evidence in conjunction with his earlier § 2255 motion. To the extent that request qualifies as a "prior motion for postconviction DNA testing," his request did not fail to request testing of the evidence at issue here. Accordingly, the Court finds that Sherrod meets the requirements of 18 U.S.C. § 3600(a)(3).

**C. DNA Testing Could Raise a Reasonable Probability that Sherrod did not Commit the Offense Pursuant to 18 U.S.C. § 3600(a)(8).**

Under 18 U.S.C. § 3600(a)(8), Sherrod must show that the proposed DNA testing "may produce new material evidence that would" support his theory of defense and "raise a reasonable probability that the applicant did not commit the offense." The Supreme Court has defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). To determine whether there is a reasonable probability that the applicant did not commit the offense, courts consider how beneficial DNA testing results would impact the evidence against a defendant as a whole.

See, e.g., <u>United States v. Thomas</u>, 597 F. App'x 882 (7th Cir. 2005); <u>United States v. Cowley</u>, 814 F.3d 691, 700 (4th Cir. 2016) (holding that DNA testing of several items found near the scene of a murder would not establish a reasonable probability the defendant did not commit the offense in light of significant evidence tying the defendant to the crime, including the defendant's prior statements and subsequent admissions to other parties, and eyewitness accounts); <u>United States v. Pitera</u>, 675 F.3d 122, 129–30 (2d Cir. 2012) (noting that when strong corroborating evidence of the applicant's guilt exists, proposed DNA testing would not raise a reasonable probability that the applicant did not commit the offense); <u>Monell</u>, 2017 WL 5564572, at *5, 10 (noting that the absence of applicant's DNA on an object would not establish the reasonable probability of his innocence when two witnesses identified applicant and video of the incident existed).

The Seventh Circuit addressed the burden of subsection (a)(8) in <u>United States v. Thomas</u>, 597 F. App'x 882 (7th Cir. 2005). There, the defendant had been convicted of drug trafficking crimes and moved for DNA testing of bags of drugs found near the scene of the crime. <u>Id.</u> at 885. At trial, the prosecution had presented

testimony from several eyewitnesses to multiple drug transactions. Moreover, "[t]he fingerprint expert acknowledged that identifiable prints had not been found on the plastic bags." Id. In light of this evidence, the Seventh Circuit found that even "if Thomas's DNA is not detectable on the bags, as he hopes, it does not call into question the strength of the evidence against him because forensic evidence that he touched the bags was never used to support the government's eyewitness statements." Id. Additionally, the Seventh Circuit noted that an absence of the defendant's "DNA on the bags would not definitively show that he never touched them or that he wasn't involved in a conspiracy to sell drugs." Id. Accordingly, the Seventh Circuit concluded that the lack of the defendant's DNA on the bags would not establish a reasonable probability that the defendant did not commit the offense. Thomas, 597 F. App'x at 885.

Here, by contrast, the Government did rely on expert testimony tying one of the hairs on the jacket to Sherrod. Using mitochondrial DNA evidence, experts found that Sherrod could not be excluded as a source for the DNA, which experts testified could only have come from a person within a group comprising .25% of

the North American population.  Accordingly, unlike <u>Thomas</u>,
Sherrod's proposed DNA testing could call into question the
strength of this piece of the Government's evidence used against
him at trial.

In response, the Government also points out that the DNA
analysis done on the jacket at the time of trial connected the jacket
to at least three people.  Resp. at 22 (d/e 134).  Accordingly, the
Government argues, that even if additional DNA testing might
identify the sources of the stain or the hairs were not Sherrod, this
would not impact the sufficiency of the evidence, as it was known
that more than one DNA profile was on the jacket.  However, this
argument ignores the fact that the Government was only able to use
mitochondrial DNA evidence to tie the jacket to Sherrod.  And,
Sherrod has advanced an argument that the FBI mitochondrial
DNA database, which was used by the expert in Sherrod's case,
may have contained inaccurate statistics, leading to inaccurate
results and testimony.  Def. Mot. at 16 (d/e 130).  That two other
individuals may have also had DNA within sweat stains on the
jacket would not have been particularly helpful to Sherrod when
expert testimony strongly tied Sherrod's mitochondrial DNA to the

jacket.  Evidence conclusively showing, contrary to the mitochondrial DNA analysis, that none of the DNA evidence on the jacket belonged to Sherrod could create a reasonable probability that he was not the perpetrator even through there was DNA evidence of at least three people contained in the stains.

At trial, of course, the Government relied on far more than just the mitochondrial DNA evidence on the jacket to tie Sherrod to the crime.  Sherrod's fingerprints were found inside the Escalade and multiple witnesses testified that Sherrod had previously stolen the firearm that was used as the murder weapon.  Two eyewitnesses, Regan Booker and Shay Guttendorf, identified Sherrod as the perpetrator.  Sherrod's own incriminating statements to law enforcement officers tied him to the scene.  Finally, video evidence showed footage of the crime, including an individual wearing a black jacket getting out of an Intrepid and what appeared to the same individual committing the crime.

Still, the Court finds that Sherrod has met his burden to show that additional testing may produce new material evidence that would raise a reasonable probability that Sherrod did not commit the offense in light of the limits of eyewitness testimony, the limits

of the testimony tying Sherrod to the gun, and the inability to determine the perpetrator's identity from the poor-qualify video footage. In a factually similar case, United States v. Fasano, 577 F.3d 572, 578 (5th Cir. 2009), the Fifth Circuit found that DNA evidence on clothes worn by the culprit could lead to new material evidence satisfying subsection (a)(8). There, the defendant had been found guilty of bank robbery. Id. The robber's identity was disputed at trial, but the evidence of the defendant's guilt included:

> (1) bank video camera footage showed a man with Fasono's build robbing the bank; (2) four eyewitnesses identified Fasono as the robber; (3) vehicle records revealed that Fasono's vehicle and another vehicle he had access to matched eyewitness descriptions of the robber's vehicle; and (4) Fasono's fingerprints were found on the demand note used in the robbery.[2]

Id. at 574 (quoting United States v. Fasono, 217 F. App'x 373, 374–75 (5th Cir. 2007)). At trial the defendant had attacked the reliability of the eyewitness testimony and pointed the finger at Mark Wesley Hughes. Hughes would have had access to the clothes because he was staying as a guest in the defendant's old room. The

---

[2] The defendant went by both Fasano and Fasono. The Fifth Circuit's 2007 opinion quoted here used the latter spelling, while the 2009 opinion used the former.

defense also argued that while the defendant's fingerprints were on the note, the paper could have come from the defendant's old room. The Fifth Circuit found that the defendant had met his burden for testing:

> There is no question but that the conviction is well supported by evidence as we concluded in affirming Fasano's conviction. If however testing does not find Fasano's DNA on the clothing and glasses but finds the DNA of Hughes the strong case evaporates; here the strength of the evidence by no means makes fanciful a conclusion that there is a reasonable probability that Fasano was not the robber. That is, unless we are to refuse to accept the weakness of eyewitness testimony, a reality that DNA testing has forced upon the legal community. There are myriad possibilities of outcomes from testing. We need not puzzle over their range. Nor do we now address the power of the results of testing.

Fasano, 577 F.3d at 578.

Similarly, Sherrod's defense at trial and his motion here attack the reliability of the eyewitness testimony and point the finger at another suspect, Derrick Crawford. As the Fifth Circuit noted, DNA evidence has forced courts to "accept the weakness of eyewitness testimony." Fasano, 577 F.3d at 578. While there is also witness testimony tying Sherrod to the gun, the credibility and consistency of this testimony was attacked at trial as well. Moreover, Sherrod provides an alternative explanation for the presence of his

fingerprints in the Escalade—that he went to the vehicle after learning of its location from Crawford and considered robbing it, <u>see</u> Def. Aff. of Innocence 3 (d/e 137-1)—which is consistent with some of his allegedly incriminating statements to law enforcement.  As in <u>Fasano</u>, if the clothes of the perpetrator of the crime were conclusively tied to the alternative suspect, Derrick Crawford, and rebutted the previous ties of the clothing to Sherrod, then Sherrod may be able to show a reasonable probability that he is not the perpetrator.  Accordingly, the Court finds that Sherrod has met the requirements of subsection (a)(8) as well.

### D. Sherrod's Motion Meets the Timeliness Requirements of 18 U.S.C. § 3600(a)(10).

Finally, there is a rebuttable presumption against timeliness for any motion under 18 U.S.C. § 3600 that is not made within sixty months of the enactment of the Justice For All Act of 2004 or within thirty-six months of the conviction, whichever comes later.  18 U.S.C. § 3600(a)(10)(B).  Sherrod's motion is presumptively untimely, as it was filed nearly fourteen years after his conviction on October 20, 2004, and the Justice For All Act of 2004's effective date of October 30, 2004.  Sherrod's motion must have been filed by

October 2009 in order to have been considered timely.[3]  Sherrod did

not file this motion until July 2018, nearly nine years after the end

of the period during which timeliness would have been presumed.

The presumption may be rebutted if the applicant shows good

cause, if the evidence to be tested is newly discovered DNA

evidence, or if a denial would result in a manifest injustice.  18

U.S.C. § 3600(a)(10)(B).  Sherrod did not affirmatively rebut the

presumption of timeliness in his original motion.  And, in its

response, the Government provided only a cursory argument

against timeliness, merely citing the requirements of the statute

and stating that they have not been met.

In reply, however, Sherrod argues that the evidence sought to

be tested—the hairs and stains on the black Carhartt jacket—are

"newly discovered" because the DNA testing procedures available at

the time of his trial could not accurately use these samples as DNA

evidence.  Sherrod's argument finds support in the Ninth Circuit

case of United States v. De Watson, 792 F.3d 1174 (9th Cir. 2015).

---

[3] Notably, Sherrod did make a request to test the additional DNA evidence on the jacket in a motion filed in conjunction with his § 2255 Motion on January 14, 2008.  See Mot. Requesting Discovery, Case No. 08-CV-02013, (d/e 3). However, Sherrod, proceeding pro se, did not file his request pursuant to 18 U.S.C. § 3600.

In De Watson, the applicant wanted to test semen found in a rape victim's underwear that was not usable as DNA evidence at the time of trial due to the then-existing methods of DNA testing. Id. at 1181. However, scientific advances since the trial made testing the semen sample possible. Id. The Ninth Circuit deemed the motion timely because the scientific advancements made usable the semen sample that was unusable at the time of trial, allowing the source of the sample to be identified at the later time. Id. at 1181–82.

Some courts have found that the specific testing methods cited by Sherrod, low-copy-number and touch DNA—have been available at least since 2001. See United States v. Morgan, 53 F. Supp. 3d 732, 735 n.1 (S.D.N.Y. 2014) (citing to several cases that have used "low-copy number testing" dating back to 2001). Upon deeper analysis, however, it appears that the term "low-copy-number" or "touch DNA" are not even agreed upon terms in the scientific community. See, e.g., 4 Mod. Sci. Evidence § 30:32 (2019-2020 Edition) ("[O]ne of the most difficult problems encountered when discussing [low-copy number] typing is the lack of agreement on what exactly it is, or even what to call it."). And, low-copy-number DNA testing is a not a single method or procedure to testing DNA,

but has been used to describe various testing methods or procedures that analyzes either low-quantity or low-quality DNA or DNA mixtures.  Id.

Moreover, it is clear from the Government's Response and the Reports from Illinois State Police Division of Forensic Services that the DNA testing methods and procedures available at the time of trial were not able to determine whose DNA was on the jacket.  See Resp. at 12–13 (stating that the Illinois State Police found that the additional hairs and eyebrow/eyelash hair were not suitable for microscopic comparison and the DNA mixture from the stain from the jacket "did not contain enough information to make positive associations to known standards"); Resp. Ex. B at 14 (d/e 134-1) (a Report from the Illinois State Police Division of Forensic Services indicating that the stain(s) on the black jacket contained a mixture of human DNA profiles but "does not contain enough information to make positive associations to known standards").  Accordingly, the fact that "low-copy-number" or "touch DNA" testing methods existed at the time of Sherrod's trial is not to say that superior methods now exist such that what could not be turned into

admissible DNA evidence at the time of Sherrod's trial now could be turned into such evidence.

Sherrod has certainly provided sufficient evidence that testing methods and procedures have improved over the last sixteen years such that the additional hairs and stain on the jacket could now be used to provide admissible DNA evidence. For example, Sherrod points to the Pittsburgh-based company Cybergenetics as an example of lab that has made considerable advances in DNA technology. Cybergenetics is one of a number of organizations that claims to have improved DNA testing capabilities on DNA mixtures with the use of "probabilistic software." Cybergenetics' software is called TrueAllele. Cybergenetics founder, Mark W. Perlin, has researched, written, and presented extensively on the failure of criminal labs to accurately interpret DNA mixture evidence under prior procedures, which often leads to "inconclusive" results, such as was reported on the three-contributor DNA mixture contained within the jacket stain analyzed in this case. <u>See, e.g.,</u> Perlin, M.W. "When DNA is not a gold standard: failing to interpret mixture evidence," <u>The Champion</u>, 42(4):50-56, May 2018 (citing multiple studies and articles written between 2005 and 2010 concerning the

problems in interpreting DNA mixtures); M.W. Perlin, "Mining the mixture - a DNA analyst explains," <u>Judicial Summer Seminars, New York State Judicial Institute</u>, Rye Brook, NY, Jun-2019 (available at https://www.cybgen.com/information/education/2019/NYSJI/Perl in-Mining-the-mixture-a-DNA-analyst-explains/page.shtml) (last visited March 2, 2020). Many of the errors or inconclusive results in older methods of DNA mixture interpretation were a result of the testing processes reliance on human operators to make subjective choices to overcome software limitations. <u>Id.</u> Probabilistic software, such as TrueAllele, is designed to take the "human factor" out of DNA testing as much as possible and have a computer objectively analyze complex mixtures of DNA. While Cybergenetics began developing its software around 20 years ago, it was not used in criminal cases until 2009—long after Sherrod's criminal trial had ended.

Further, the Court finds that nothing in the plain language of the Innocence Protection Act that indicates that there is an additional timeliness requirement to apply if the Court finds that the evidence to be tested is newly discovered DNA evidence under § 3600(a)(10)(B). <u>But see</u>, <u>United States v. MacDonald</u>, 37 F. Supp.

3d 782, 792 (E.D.N.C. 2014) (holding that defendant failed to rebut the presumption of untimeliness and noting that the type of DNA testing requested had been available for at least five years before the defendant's motion was filed, although not available at trial).  It might be presumed that "newly discovered" should at least be limited to that evidence which was discovered after the time a motion would have been presumptively timely.  Here, that would be after October 2009.  Of course, in <u>De Watson</u>, the Ninth Circuit did not appear to read this timeliness limitation into the definition of "newly discovered," or any other additional timeliness requirement.

Regardless, even since Sherrod's Motion became presumptively untimely in 2009, DNA testing has continued to develop and lead to more reliable—and admissible—DNA testing.  <u>See, e.g.,</u> <u>United States v. Williams</u>, No. 3:13-CR-00764-WHO-1, 2017 WL 3498694, at *1 (N.D. Cal. Aug. 15, 2017) ("Methods involving mixed samples, limited amounts of DNA, and suspect-driven statistical interpretations are undergoing scrutiny and continued refinement.  Laboratories across the country continue to make changes to their protocols based on new developments.");  <u>United States v. Wilbern</u>, No. 17-CR-6017 CJS, 2019 WL 5204829,

at *16 (W.D.N.Y. Oct. 16, 2019) (addressing arguments that DNA testing results procured under older low copy number testing methods in 2011 should be deemed inadmissible in light of a criminal lab's discontinuing its use of that method in light of newer technology that produces more reliable results). See also, United States v. McCluskey, 954 F. Supp. 2d 1224, 1277 (D.N.M. 2013) (finding low copy number DNA testing results unreliable where lab did not use any special procedures or methods of interpretation).

And, it seems it would be difficult, if not impossible, to say when DNA analysis advances would have made it possible to reliably test the DNA samples on the jacket that in 2003 the Illinois Forensic Lab determined were beyond testing capabilities. In fact, it is possible that, even now, testing methods might have not advanced to test the limited DNA evidence on the jacket. However, the only way to resolve this uncertainly is submit the previously-unusable DNA evidence for testing now and allow Sherrod at least a chance to prove his innocence of his life sentence.

### III.  CONCLUSION

For the reasons above, Defendant Sherrod's Motion Requesting Post-Conviction DNA Testing Pursuant to 18 U.S.C.

§ 3600 (d/e 130) is GRANTED. The Court appoints the Federal Public Defender Office as counsel for the Defendant pursuant to 18 U.S.C. § 3600(b)(3) for the purposes of coordinating the DNA testing. The Court ORDERS counsel for Defendant to file additional briefing regarding Defendant's position on testing procedures pursuant to 18 U.S.C. § 3600(c) within 21 days of this Order. The Government shall file a response within 21 days of service of Defendant's brief.

**ENTERED: March 2, 2020**

**FOR THE COURT:**       */s/ Sue E. Myerscough*
                    **SUE E. MYERSCOUGH**
                    **UNITED STATES DISTRICT JUDGE**