# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# URBANA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**ANTONIO SHERROD,** )<br>)<br>**Defendant.** ) | Case No. 04-CR-20001 |

## ORDER AND OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

Before the Court is the Government's Motion to Reconsider the Court's Order for Additional DNA Testing Pursuant to 18 U.S.C. § 3600 (d/e 148). For the reasons stated below, the Court finds that no further DNA testing is warranted and GRANTS the Government's Motion (d/e 148).

### I.  BACKGROUND

For ease of reference, the Court has reproduced the underlying facts as previously summarized in the Court's March 3, 2020 Order and Opinion (d/e 142):

In March of 2003, Stephen Prendergast stopped at a gas station in Kankakee, Illinois, around midnight. Prendergast was driving to Champaign, Illinois, with his girlfriend in a 2003 Cadillac Escalade. While Prendergast went inside the gas station's convenience store, a Dodge Intrepid parked at a gas pump adjacent to the Escalade. When Prendergast returned to the Escalade, an individual exited the Intrepid and shot Prendergast at point-blank range after demanding the keys to the Escalade. Prendergast died shortly afterward from a bullet that pierced his heart.

Prendergast was a resident of Matteson, Illinois, located north of Kankakee, Illinois. His girlfriend, Regan Booker,[1] also lived in Matteson. Regan Booker, Loren Booker (Regan's sister), and Loren's friend, Tiffany Sanders, attended Parkland College in Champaign, Illinois. They often travelled back and forth between Matteson and Champaign.

---

[1] The witness's name has alternatively been spelled "Regan" and "Reagan" throughout various documents in this case. Compare Pet. Mot. (d/e 130), Gov't Resp. (d/e 134), and United States v. Sherrod, 445 F.3d 980, 981 (7th Cir. 2006) (all spelling witness's name as "Regan"), with Gov't Witness List (d/e 36); Sherrod v. United States, Case No. 08-cr-2013 (C.D. Ill.), Order (d/e 16) (spelling witness's name as "Reagan"). As the parties appear to agree for the purpose of this Motion that the witness's name is spelled "Regan," the Court will adopt that spelling as well.

On March 16, 2003, Prendergast, Regan Booker, Loren Booker, and Tiffany Sanders departed from Matteson on their way to Champaign. Prendergast and Regan Booker rode in Prendergast's Escalade, while Loren Booker and Sanders travelled in a second car.

Shortly before midnight, the group stopped at the Amoco gas station in Kankakee. Prendergast parked his Escalade near one of the gas pumps. Sanders parked the second car on the opposite side of the same pump island. Prendergast entered the adjacent convenience store, while the others waited outside.

Video evidence showed that while Prendergast was in the store, a tan or gold Dodge Intrepid arrived at the gas station, slowly circled around the Escalade, and parked at an adjacent pump island. An individual, later shown to be the perpetrator, was in the backseat on the passenger side of the Intrepid. He got out of the Intrepid, and then went back to put on a black jacket. He approached the front of the store and then returned to the Intrepid, which had pulled up to the store to meet him. After the perpetrator got back into the Intrepid, the Intrepid again drove slowly past the Escalade and left the gas station.

Shortly after the Intrepid departed from the gas station, Prendergast left the store and returned to the Escalade. Immediately after Prendergast and Regan Booker entered the Escalade, the perpetrator, brandishing a 9 mm gun and wearing a black Carhartt jacket, confronted Prendergast at the driver's door and shot him through the left arm. The bullet traveled through Prendergast's arm and into the left side of his lower chest, piercing his heart.

Regan Booker jumped out of the Escalade, ran to the back, and peered around the vehicle to where the perpetrator and Prendergast were standing. The perpetrator demanded the keys to the Escalade and attempted to shoot Prendergast a second time, but the gun malfunctioned. Regan Booker saw the perpetrator's face as Prendergast, who was doubled over, slid the Escalade's keys to him. As the perpetrator fled the gas station in the Escalade, Prendergast collapsed on the gas station lot. The incident was captured on video by the store's security system.

The incident was also witnessed by Shay Guttendorf, a store employee, who called 911. An ambulance and law enforcement

officers arrived at the scene shortly after the 911 call. Prendergast was rushed to the hospital, but he died from the gunshot wound.

The perpetrator stole the Escalade, but police found the vehicle abandoned several hours later in an area north of the gas station. A short distance from the Escalade, police recovered a black Carhartt jacket and the handgun used in the attack.

The police investigation soon identified Defendant Antonio Sherrod as a suspect in the crime. A fingerprint analysis determined that Sherrod's fingerprints were found inside the Escalade, on the steering wheel and the driver's door. Forensic evidence linked the bullet fragment that caused Prendergast's death to the handgun found near the scene. Evidence from various witnesses also linked the handgun found near the Escalade to Sherrod, who witnesses claimed had stolen it just weeks prior to the shooting. At trial, Sherrod attacked the credibility of these witnesses, in part, based on their inconsistent statements and on the promises of immunity they were given by the Government in exchange for their testimony.

Later, at Sherrod's request, analysis was also done on the black Carhartt jacket found near the Escalade. A report from the

Illinois State Police Division of Forensic Services determined the jacket contained DNA that was linked to at least three people, but a stain on the wrist of the jacket and hair found on the jacket did not contain enough information to make positive identification. Resp. Ex. B at 12–15 (d/e 134-1). DNA retrieved from hair found on the jacket revealed that Sherrod could not be excluded as a source for the DNA, which experts testified could only have come from a person within a group comprising .25% of the North American population.

In late 2003, after the investigation had identified Sherrod as a possible suspect, Regan Booker and Shay Guttendorf were shown a six-person photo array that contained Sherrod's photograph. Both women identified Sherrod as the person who shot Prendergast. The defense questioned the credibility of these witnesses.

On December 8, 2003, Sherrod was charged in a criminal complaint and this case, in the United States Central District of Illinois, was opened. Complaint (d/e 1). Sherrod was arrested and taken to the Kankakee Police Department. Lieutenant Pat Kane of the Kankakee Police Department and Special Agent Dennis Fritzsche planned to interview Sherrod and activated a video

recorder. Sherrod appeared upset about being arrested and asked, "What this all about, man?" Eventually, Sherrod stated that he did not want to be recorded and the officers turned off the video. Officers testified that, after receiving Miranda warnings, Sherrod was told by Kane that he was under arrest for car-jacking and murder. During the interview, Sherrod first denied that he had ever been inside the Cadillac Escalade. Without being told about the evidence against him, Sherrod made statements including: "I'll bet the video don't show my real face, do it?," that the woman in the front seat of the vehicle "can't identify me," and that you "[c]an't trust those whores at the gas station." He also denied that his fingerprints would be found on the gun or in the vehicle. After less than 15 minutes, Sherrod invoked his right to counsel and the interview was terminated.

On December 9, 2003, Sherrod was transported to the Federal Courthouse in Urbana, Illinois. After observing that Sherrod appeared highly agitated, a Deputy U.S. Marshal requested that Special Agent Fritzsche attempt to calm him down. After Fritzsche approached Sherrod's cell, Sherrod volunteered that he should not be in trouble if he had only tried to steal the radio.

Sherrod's case proceeded to a five-day jury trial in the Central District of Illinois in October 2004. At trial, the Government's theory was that Sherrod's friend, Derrick Crawford, had driven the Dodge Intrepid, that Sherrod had exited the vehicle at the gas station, and that Sherrod was later the perpetrator in the crime. The defense theory was that Derrick Crawford was the true perpetrator and that Sherrod was not involved in the murder or carjacking. On October 20, 2004, the jury found Sherrod guilty of carjacking with the intent to cause death and serious bodily harm (18 U.S.C. § 2119(3)), carrying and using a firearm to commit first degree murder (18 U.S.C. §§ 924(c)(1)(A)(iii), (D)(ii) and (i)(1)), and felon in possession of a firearm (18 U.S.C. § 922(g)(1)). Jury Verdict (d/e 69, 70, 71).

On February 11, 2005, District Judge Michael P. McCuskey sentenced Sherrod to two consecutive terms of life imprisonment. Judgment (d/e 91). Sherrod appealed his conviction, challenging the jurisdictional basis of the carjacking conviction, the trial court's admission of statements made after his arrest, and the determination of his sentence. United States v. Sherrod, 445 F.3d

980, 981 (7th Cir. 2006). The Seventh Circuit rejected each challenge and affirmed Sherrod's conviction. Id.

Sherrod subsequently filed a Motion to Vacate, Set Aside, or Correct his sentence under 28 U.S.C. § 2255. Mot. to Vacate, Case No. 08-CV-02013, (d/e 1). In conjunction with his § 2255 motion, Sherrod also filed a motion requesting additional DNA testing of the hair found at the scene of the crime and the stains on the jacket. Mot. Requesting Discovery, Case No. 08-CV-02013, (d/e 3). The Court denied Sherrod's § 2255 motion, finding that Sherrod was not entitled to relief on any of the grounds raised. The Court also denied Sherrod's motion requesting discovery, finding that Sherrod failed to show good cause for the discovery or that a constitutional violation occurred during his trial. Opinion 29–30, Case No. 08-CV-02013, (d/e 16).

Sherrod filed a Motion Requesting Post-Conviction DNA Testing Pursuant to 18 U.S.C. § 3600 on July 12, 2018. Def. Mot. (d/e 130). Sherrod asserted that he is innocent of the charges and that he was framed. Sherrod moved under 18 U.S.C. § 3600 to have additional DNA testing performed on the hairs and sweat found on the black Carhartt jacket. Specifically, Sherrod stated

that there were hairs found on the jacket, a "Negroid head-hair fragment, additional human hairs, and one (1) apparent eyebrow/eyelash." Id. at 10. Additionally, there were sweat stains on the wrist area, neck area, and chest of the jacket. The results of the sweat stain that was tested prior to trial revealed that it belonged to three different contributors, but the test could not identify a particular person. Id.

Sherrod asserted that a new form of DNA testing known as "low-copy-number" analysis would allow for a more accurate DNA profile of the individual he asserts was the murderer. Sherrod also asserted that:

> Today, most large labs have access to cutting-edge extraction kits capable of obtaining usable DNA from the smallest of samples, like so called touch DNA (a smear thumbprint on a window, or a speck of spit invisible to the eye), and of identifying individual DNA profiles in complex mixtures, which include genetic material from multiple contributors.

Id. at 14. Further, Sherrod stated "[a] Pittsburg[h] based company, Cybergenetics has the capabilities in testing the sweat, and hair fibers located on the Black Carhartt Jacket [and] even re-analyze the one (1) hair fiber that was tested." Id. at 15.

In response, the Government argued that Sherrod has failed to meet all ten of the requirements under 18 U.S.C. § 3600 and, therefore, his motion must be denied. (d/e 134). The Government reports that the head hair fragment submitted for DNA testing during the trial was consumed during the testing, so no longer exists. Id. at 12. However, the Government does have possession of the additional head/eyebrow/eyelash hairs found on the jacket and possible stain evidence found in the left wrist area of the jacket. Id. Sherrod submitted a Reply on January 25, 2019 (d/e 137), which included an Affidavit of Innocence (d/e 137-1).

On March 3, 2020, this Court granted Sherrod's Motion and appointed the Federal Public Defender for Sherrod for purposes of coordinating the DNA testing. See d/e 142.

On July 29, 2020, the Government filed the instant Motion to Reconsider the Court's Order (d/e 148). After his counsel requested multiple extensions of time to file a response, Sherrod sent a letter to the Court seeking to have the Court order immediately all the DNA retested. See d/e 151. Sherrod's letter disclosed that his attorney had worked with Cybergenetics to analyze the DNA profiles previously taken from the Carhartt jacket. This analysis matched

Sherrod's DNA to one of the contributors on the inner wristband of the Carhartt jacket. Sherrod also attached a letter from his attorney that stated, while this analysis was not "formal" or "confirmed," that there was no reason to believe that the results could change.

Shortly after Sherrod sent his letter to the Court, Sherrod's counsel moved to withdraw, d/e 152, which the Court granted. Sherrod next filed an additional letter, d/e 153, explaining other non-DNA related evidence he believes has been suppressed. On May 3, 2021, Sherrod filed a response to the Government's motion. See d/e 156. This order now follows.

## II. LEGAL STANDARD

"[M]otions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits." See United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010). Under Federal Rule of Civil Procedure 59(e), courts are able to correct their own errors and avoid unnecessary appeals. Miller v. Safeco Ins. Co. of Am., 683 F.3d 805, 813 (7th Cir. 2012) (internal citation omitted); see also, Vesely v. Armslist LLC, 762 F.3d 661, 666 (7th Cir. 2014)

("[W]e have held that a Rule 59(e) motion is not to be used to 'rehash' previously rejected arguments").

### III. DISCUSSION

As discussed in depth in the Court's prior Order, motions for postconviction DNA testing made pursuant to 18 U.S.C. § 3600 must fulfill ten requirements before testing will be authorized. United States v. Thomas, 597 Fed. Appx. 882, 884 (7th Cir. 2015). In its motion for reconsideration, the Government argues that the requirement under 18 U.S.C. § 3600(a)(8) has not been met. This subsection requires that the DNA testing requested must have the potential to "produce new material evidence that would . . .raise a reasonable probability that the applicant did not commit the offense." 18 U.S.C. § 3600(a)(8).

In the Court's prior Order, the Court found this requirement was met because Sherrod's motion called into question the mitochondrial DNA evidence extracted from the hair found on the jacket. And, the Court found, that evidence conclusively showing, contrary to the mitochondrial DNA analysis presented at trial, "that none of the DNA evidence on the jacket belonged to Sherrod could create a reasonable probability that he was not the perpetrator."

However, the Government has presented additional evidence that, despite subsequent criticism of the mitochondrial DNA analysis used at the trial, the analysis was accurate. At trial, Sherrod's DNA Expert, Dr. Terry Melton, testified that Sherrod could not be excluded as a source for the DNA from the hair, which could only have come from a person within a group comprising .25% of the North American population. Dr. Melton used the "SWGDAM" database to make this determination. This hair was consumed during the DNA testing. In his motion, Sherrod presented evidence that the SWGDAM database had since been subject to criticism and may not have been accurate. However, as the Government's expert, Ms. Dimick, explains, criticisms of the database does not impact the original mtDNA analysis of the hair fragment conducted by Dr. Melton. Put another way, the mitochondrial DNA profile created by Dr. Melton has not been challenged. Rather, Sherrod's motion highlighted criticism of the database that Dr. Melton used to find that the mitochondrial DNA profile came from a group comprising .25% of the North American population.

Ms. Dimick explains that the SWGDAM database has been replaced by the EMPOP database under current convention. Ms. Dimick recently used the mitochondrial DNA profile created from the hair fragment from the jacket and that of Sherrod and compared them using the EMPOP database. The results of that analysis confirmed the accuracy of the initial mtDNA analysis conducted by Dr. Melton. Specifically, Ms. Dimick reported that:

> 31. Irrespective of the database used greater than 99% of the North American population can be excluded as having the mitochondrial DNA type found in the 2454Q1 hair.
>
> 32. Additional testing will not negate the findings of Mitotyping Technologies. The mitochondrial DNA sequences of 2454Q1 and 2454K1 are the same. Therefore, Antonio Sherrod and his maternal relatives are not excluded as the contributor of the questioned hair.

Gov't Motion to Reconsider, Exhibit 2, d/e 148-2. While Sherrod posits that this new database might suffer from defects as well, he has presented no evidence or support for his argument.

The Court agrees that with the validity of the mitochondrial DNA evidence no longer in question, no further DNA testing is warranted. Sherrod can no longer plausibly meet the requirement under 18 U.S.C. § 3600(a)(8) because Sherrod can no longer

plausibly rebut the previous evidence that tied the perpetrator's clothing to him. As discussed in the Court's previous order, the Seventh Circuit addressed the burden of subsection (a)(8) in <u>United States v. Thomas</u>, 597 Fed. Appx. 882 (7th Cir. 2005). There, the defendant had been convicted of drug trafficking crimes and moved for DNA testing of bags of drugs found near the scene of the crime. <u>Id</u>. at 885. At trial, the prosecution had presented testimony from several eyewitnesses to multiple drug transactions. Moreover, "[t]he fingerprint expert acknowledged that identifiable prints had not been found on the plastic bags." <u>Id</u>. In light of this evidence, the Seventh Circuit found that even "if Thomas's DNA is not detectable on the bags, as he hopes, it does not call into question the strength of the evidence against him because forensic evidence that he touched the bags was never used to support the government's eyewitness statements." <u>Id</u>. Additionally, the Seventh Circuit noted that an absence of the defendant's "DNA on the bags would not definitively show that he never touched them or that he wasn't involved in a conspiracy to sell drugs." <u>Id</u>. Accordingly, the Seventh Circuit concluded that the lack of the defendant's DNA on the bags would not establish a reasonable probability that the

defendant did not commit the offense. Thomas, 597 Fed. Appx. at 885.

Without being able to rebut the mitochondrial DNA evidence on the jacket, Sherrod's case is no longer distinguishable from Thomas. Even if DNA testing reveals that the DNA of others is present in the sweat stain, the fact that other individuals' DNA was on the jacket was *presumed* at trial: experts testified that the DNA from the sweat stain came from three separate individuals. Like Thomas, even if Sherrod's DNA is not found on the jacket in additional testing, it would "not call into question the strength of the evidence against him."

The Government also points to 18 U.S.C. § 3600(g), which outlines the procedure for allowing a motion for a new trial if the defendant obtains favorable DNA test results:

> (1) . . . if DNA test results obtained under this section exclude the applicant as the source of the DNA evidence, the applicant may file a motion for a new trial or resentencing, as appropriate. . . .
>
> (2) . . . The court shall grant the motion of the applicant for a new trial or resentencing, as appropriate, if the DNA test results, when considered with all other evidence in the case (regardless of whether such evidence was introduced at trial), establish by compelling evidence that a new trial would result in an acquittal of . . . the Federal

>offense for which the applicant is sentenced to imprisonment . . . .

18 U.S.C.A. § 3600(g). This section is not necessarily applicable to the burden Sherrod needs to meet to obtain new DNA testing, but this section does highlight the futility of further testing. No matter the results of further DNA testing, Sherrod will be unable to file a motion for a new trial because he cannot be excluded as the source of the DNA evidence.

Finally, the Court notes that Sherrod has also presented evidence that further DNA testing would be futile. See d/e 151. Sherrod has reported that additional DNA analysis has been conducted on the sweat stains from the jacket. Sherrod's former counsel, federal public defender Rosana Brown, worked with Dr. Perlin at Cybergenetics to analyze the DNA profiles previously taken from the Carhartt jacket. This analysis matched Sherrod's DNA to one of the contributors on the inner wristband of the Carhartt jacket. These results have not been formally presented to the Court by an expert, so the Court declines to base the Court's decision on this evidence. However, the Court notes that Sherrod has, in fact, already obtained much of the additional DNA analysis he requested.

Even if Sherrod is actually innocent as he claims and he has been framed by the Government and others, further DNA testing and analysis will not help Sherrod with his quest for exoneration.

The Court also notes that Sherrod argues that he received ineffective assistance of counsel when Ms. Brown allowed Dr. Perlin to use the DNA profiles that had previously been created from the sweat stains on the Carhartt jacket. It is not clear how counsel could have been ineffective for seeking and obtaining additional DNA analysis for Sherrod when he was arguing he was actually innocent and that his DNA would not be on the jacket. Moreover, the Court does not base the decision here on the evidence obtained from this analysis, so Sherrod cannot show prejudice either.

## IV. CONCLUSION

For the reasons stated above, the Court finds that no further DNA testing is warranted and GRANTS the Government's Motion (d/e 148). The Court has reconsidered its previous order (d/e 142) and now DENIES Defendant Sherrod's Motion Requesting Post-Conviction DNA Testing Pursuant to 18 U.S.C. § 3600 (d/e 130)

because he cannot meet the prerequisite under 18 U.S.C. § 3600(a)(8) for obtaining DNA testing.


**ENTERED: September 29, 2021**

**FOR THE COURT:**        */s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**